## In re GENERAL INSTRUMENT CORPORATION SECURITIES LITIGATION.

**This Document Relates To: Derivative Action BKP Partners, L.P., et al.**

### No. 96 C 1129.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 22, 1998.

Stanley Allen Schlitter, Gregory C. Vamos, Jenner & Block, Chicago, IL, J. Michael Williams, Frederick R. Ball, Holleb & Coff, Chicago, IL, Ronald L. Futterman, Futterman & Howard, Chtd., Chicago, IL, Allan Steyer, Jeffrey H. Lowenthal, Suzanne R. Sullivan, Steyer, Lowenthal, Boodrookas & Walker, LLP, San Francisco, CA, for BKP Partners, L.P.

Ronald L. Futterman, Futterman & Howard, Chtd., Chicago, IL, Allan Steyer, Jeffrey H. Lowenthal, Suzanne R. Sullivan, Steyer, Lowenthal, Boodrookas & Walker, LLP, San Francisco, CA, for Bob K. Pryt, Peter A. Bessette, Donald M. Bronstein, Kurt Butenhoff, Common Sense Partners, L.P., Roger Richter, Robert M.D. Cross, Alan Baer, DLD Holdings, Inc., Richard H. Grace, Ann K. Grace, David K. Hedreen, Klein Investment Group, L.P., JMG Capital Partners, L.P., Alan Levinson, Lori Levinson, Charles N. Mathewson, Prism Partners I, Prims Partners II, Robert K. Pryt, Gary J. Shemano, Sonz Partners, L.P., Stuart H. Zimmerman, Ken Abdalla, Bear Stearns Securities Corp.

Steven L. Bashwiner, Mary Ellen Hennessy, Ronald Steven Betman, Edward X. Clinton, Jr., Sean M. Berkowitz, Katten, Muchin & Zavis, Chicago, IL, Noelle Christine Brennan, E.E.O.C., Chicago, IL, for General Instrument Corp.

John P. Lynch, Rene Marie Devlin, Latham & Watkins, Chicago, IL, for Richard S. Friedland.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

This is the second coming of a consolidated securities action the Court dismissed with leave to amend on September 24, 1997, holding that Plaintiffs' amended complaints failed to plead fraud with the particularity required by Fed.R.Civ.P. 9(b). Now before the Court are two motions to dismiss filed by Defendant General Instrument Corporation ("GIC") and other named Defendants (collectively "Defendants"). Defendants' motions seek to dismiss a direct claim brought under the Securities Exchange Act of 1934 ("Exchange Act") and all derivative claims brought under the laws of California and Delaware.

The controversy concerns three separate but unquestionably related civil actions that were transferred to the Court, via an Order from the Judicial Panel on Multi–District Litigation, for coordinated and consolidated pretrial proceedings. *See In re Gen. Instrument Corp. Sec. Litig.,* Master File No. 96 C 1129. This phase of the proceedings, however, only concerns two of the three actions, namely the derivative and the BKP Partners, L.P., et al. suits. Because Defendants' motions to dismiss were filed together and in-

volve almost identical factual allegations, the Court will rule on both of them in this "consolidated" Memorandum Opinion and Order.

## BACKGROUND

A detailed restatement of the alleged misrepresentations and omissions is not necessary for the disposition of these motions.[1] What is necessary, though, is a brief synopsis of the facts that precipitated the Next Level Communications ("Next Level") and the GIC derivative suits.

On October 24, 1995, Plaintiff Seymour Lazar ("Lazar"), a shareholder of GIC, instituted a derivative action against T. Forstmann, N. Forstmann, Klinsky, Akerson, Brown, Strauss, O'Rourke, Friedland, Drendel, Stern, Meyerson, Rohatyn, Forester (collectively "Directors"), Forstmann Little & Co. ("FLC"), MBO–IV, Instrument Partners, and other named executive officers of GIC. During the week of April 20, 1995, Brown, Strauss, Rourke, MBO–IV, and Instrument Partners sold more than 15.5 million shares of GIC, the aggregate proceeds from which exceeded $516,000,000.[2] T. Forstmann, N. Forstmann, Klinsky, and Akerson are general partners of the MBO–IV and/or Instrument Partners partnerships.

According to the Complaint, the Directors breached their fiduciary duties when they concealed certain adverse financial information and otherwise failed to properly manage GIC's affairs. Specifically, Lazar alleges that the Directors omitted and misrepresented certain material facts concerning the progress and profitability of two new telecommunications products GIC was in the process of developing. This artificially inflated the price of GIC's stock from March 21, 1995 to October 18, 1995, and thereby enabled a majority of the Directors to sell their GIC shares before this adverse information was publicly disclosed and reflected in the stock price.

On August 30, 1995, GIC, Next Level, and NLC Acquisition (a wholly owned GIC subsidiary, hereafter "NLC") executed a stock for stock merger agreement, whereby Next Level's shares were exchanged for newly issued GIC shares, and then NLC was merged into Next Level. As a result, the former shareholders of Next Level ("BKP") are now shareholders of GIC, and GIC is now the sole shareholder of Next Level.[3] The exchange value of the GIC shares was based on its average trading price on the New York Stock Exchange over a ten day period. Next Level's shares, however, were not registered, so the parties agreed to a value of $7 per share. Next Level and NLC were incorporated in California, and GIC is a Delaware corporation. BKP also claims that GIC inflated the value of its stock by purposely failing to disclose certain damaging financial information both before and during this ten day averaging period. Thus, BKP contends that it was duped into exchanging its shares in Next Level for fewer shares in GIC than would have otherwise been the case.

## DISCUSSION

### I. Standards for Motions to Dismiss

When considering a motion to dismiss, the Court examines the sufficiency of the Complaint, not the merits of the lawsuit. See Triad Assocs. v. Chicago Hous. Auth., 892 F.2d 583, 586 (7th Cir.1989). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A motion to dismiss will be granted only if the Court finds that the plaintiff can prove no set of facts that would entitle her to relief. See Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 432 (7th Cir.1993); Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On a motion to dismiss, the Court

---

1. A summary of the alleged security violations may be found in the Court's prior holding. See In re Gen. Instrument Corp. Sec. Litig., 1997 WL 610452, at *1 (N.D.Ill. Sept. 24, 1997).

2. Additionally, from July 28, 1995 to August 2, 1995, Akerson sold 362,665 GIC shares for $13,-275,143.

3. Actually, GIC was the sole shareholder of Next Level. On July 28, 1997, GIC split up into three publicly traded companies, one of which is Next Level Systems, Inc. Nonetheless, this reorganization has no bearing on the Court's holding and, thus, hereafter will not be considered.

draws all inferences and resolves all ambiguities in the plaintiff's favor and assumes that all well-pleaded facts are true. *See Dimmig v. Wahl,* 983 F.2d 86, 86 (7th Cir.1993).

## II.  § 14(a) Violation

Count I of BKP's Complaint claims that Defendants' solicitation of BKP's shares in Next Level violated § 14(a) of the Exchange Act. Section 14(a) provides that:

> It shall be unlawful for any person ... to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered on any national securities exchange in contravention of such rules and regulations as the (Securities and Exchange) Commission may prescribe.

15 U.S.C. § 78n(a).

Whether GIC actually contravened such rules and regulations is of no consequence, since Defendants argue that § 14(a) is only triggered when the *solicited* stock is registered under § 12 of the Exchange Act. Because Next Level's stock was not registered under § 12, Defendants conclude that BKP can not state a claim for relief under § 14(a). Thus, the sole contested issue is whether § 14(a) only applies to the solicitation of registered securities—*i.e.,* must the solicitee be registered, or is it sufficient that the solicitor is registered.

BKP urges the Court to adopt a "flexible" interpretation of the phrase "in respect of any security," so that an implied right of action will exist under § 14(a) if the challenged solicitation involves *any* registered security. In light of the ample authority to the contrary, however, BKP's position is simply untenable. For example, in *Borak v. J.I. Case Co.,* 317 F.2d 838, 848 (7th Cir.1963), the Seventh Circuit took a narrower view than BKP proposes and explained that "Section 14(a) prohibits the solicitation of proxies of securities listed on a national exchange in violation of SEC Rules promulgated thereunder." On appeal the Supreme Court echoed the court's reading and noted: "[t]he section [14(a) ] stemmed from the congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security *bought* on a public exchange.'" *J.I. Case Co. v. Borak,* 377 U.S.

426, 429, 84 S.Ct. 1555, 12 L.Ed.2d 423 (emphasis added) (citing H.R.Rep. No. 1383, 73d Cong., 2d Sess., 13).

Subsequent decisions also support Defendants' position. *Republic Technology Fund, Inc. v. Lionel Corp.,* 483 F.2d 540 (2nd Cir. 1973), involved a stock for stock merger, much like the one in this case, where the Second Circuit held that a former shareholder of the target company could not bring an action against the publicly held acquiring company under § 14(a) because the solicited "common [stock] was not registered." *Id.* at 545. *See E.H.I. of Fla., Inc. v. Ins. Co. of N. America,* 499 F.Supp. 1053, 1060 (E.D.Pa. 1980) (§ 14(a) is only applicable when the solicited security is registered); *Edelman v. Decker,* 337 F.Supp. 582, 587–88 (E.D.Pa. 1972) (same).

Against this background and insofar as § 14(a) is concerned, it is clear that BKP's claim cannot withstand Defendants' attack. The challenged statements solicited Next Level's shares—shares that were not registered pursuant to § 12 of the Exchange Act. Consequently, Count I of BKP's Complaint fails to state a claim for relief and is dismissed with prejudice.

## III.  *The Derivative Claims*

That the directors, not the shareholders, control the institution and disposition of the corporation's litigation is a fundamental precept of corporate law. *See Zapata Corp. v. Maldonado,* 430 A.2d 779, 782 (Del.1981). Yet, without some independent oversight, management's torpid or faithless acts may escape judgement with impunity. *See Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984). Thus, a shareholder may institute a derivative suit, but since doing so will necessarily impinge upon the directors' managerial prerogative, the law tempers this right by imposing several prerequisites, two of which are at issue here.

### A.  *Continuing Ownership Standing Requirement*

Defendants contend that BKP lacks standing to bring a derivative action on behalf of Next Level because BKP no longer owns an interest in Next Level. BKP counters that

neither Rule 23.1 of the Federal Rules of Civil Procedure nor its substantive state-law counterpart, § 800 of the California Corporations Code, requires an ownership interest at the time the derivative suit is filed or throughout the litigation when, as here, the alleged wrong itself divested plaintiffs of their ownership interest in the derivative corporation.

The issue, then, is whether a plaintiff lacks standing to bring a derivative suit on behalf of a corporation when he previously, but—as a result of the alleged wrong—now no longer owns an interest in the corporation on whose behalf the suit was brought. To answer this question, however, requires that the Court first determine whether federal or California law applies.

### 1. Federal Standing Requirement

█ Rule 23.1 [4] "concerns itself soley with the adequacy of the pleadings; it creates no substantive rights." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 544, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984) (Stevens, J. concurring). Nevertheless, a number of federal jurisdictions, including this one, require that the plaintiff maintain an ownership interest throughout the derivative litigation. *See, e.g., Issen v. GSC Enter.*, 538 F.Supp. 745, 752 (N.D.Ill.1982); *Schilling v. Belcher*, 582 F.2d 995, 999 (5th Cir.1978); *In re Pittsburgh & Lake Erie R.R. Co.*, 543 F.2d 1058, 1065–67 (3rd Cir.1976). Yet, this federal "continuing ownership requirement" is not always applicable—for it is dependent on the substance of the derivative claim.

In *Susman v. Lincoln Am. Corp.*, 587 F.2d 866, 871 (7th Cir.1978), the district court had dismissed several supplemental state-law based derivative claims because the plaintiff could not satisfy Delaware's continuing ownership requirement. On appeal, the plaintiff argued that the district court should have applied the federal derivative standing requirement, but the court disagreed, holding that:

> [w]e do not need to address the plaintiff's assertion that federal rather than state law should apply in determining the capacity of

a shareholder to bring [this] suit ... *since it is clear that the derivative claims asserted by the plaintiff are founded solely on state law....* The only question, then, is whether under [the law of the state of incorporation] the plaintiff may maintain this derivative suit.

*Id.* (emphasis added). The implication that *Erie's* substantive versus procedural dichotomy is equally applicable to state law claims brought under 28 U.S.C. § 1367 is well settled. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (stating that a federal court is "bound to apply state law" to its pendent claims); *Timmerman v. Modern Indus., Inc.*, 960 F.2d 692, 696 (7th Cir.1992) ("[F]ederal courts exercising pendent or diversity jurisdiction must apply state law to matters of substantive law."); *Milazzo v. O'Connell*, 925 F.Supp. 1331, 1346 (N.D.Ill. 1996) ("When we decide claims brought under state law pursuant to ... [section] 1367, we apply state law to those claims.").

BKP's derivative claims seek to vindicate purely state-created rights—rights that this Court can not displace by applying federal substantive law. *See United Mine Workers*, 383 U.S. at 726, 86 S.Ct. 1130. Therefore, the Court finds that California law, Next Level's state of incorporation, governs the issue of derivative standing.

### 2. California's Standing Requirement

█ The next issue before the Court is whether, under California law, a plaintiff in a derivative action must be a shareholder *both* at the time he filed the derivative suit and at the time of the transaction of which he complains. To this Court's knowledge, no California decision has yet decided whether § 800 of the California Corporations Code requires an ownership interest in the derivative corporation when a derivative suit is filed. Thus, this Court's task "is to determine what the [Illinois] courts would think the California courts would think on an issue about which neither has thought." *Nolan v.*

**4.** Rule 23.1 provides in pertinent part as follows: "The complaint shall ... allege [ ] that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law."

*Transocean Air Lines,* 276 F.2d 280, 281 (2d. Cir.1960) (Friendly, J.). So the Court begins with an analysis of the plain meaning of the statute. *See People v. Coronado,* 12 Cal.4th 145, 151, 48 Cal.Rptr.2d 77, 906 P.2d 1232 (1995).

California's Corporations Code § 800(b)(1), like Federal Rule 23.1, does not expressly impose a continuing ownership requirement. It provides that "[n]o action may be instituted or maintained ... by any holder of shares ... unless ... plaintiff alleges in the complaint that plaintiff was a shareholder ... at the time of the transaction or any part thereof of which plaintiff complains."

A close comparison between § 800 and Rule 23.1 reveals a glaring difference. Rule 23.1 requires an ownership interest "at the time of the transaction of which the plaintiff complains," but § 800(b)(1) only requires an ownership interest "at the time of the transaction *or any part thereof."* (emphasis added). By only requiring an ownership interest during "any *part"* of the alleged wrong, it necessarily follows that the plaintiff's ownership interest in the corporation need only exist at either the beginning, the middle or the end of the alleged wrong, but not all three. Obviously, a part of the alleged wrong will always precede the filing of the suit. So, if the plaintiff was a shareholder when the alleged wrong occurred, but not when the derivative suit was filed or thereafter, he would still comply with the clear mandate of § 800(b)(1). *See Shields v. Singleton,* 15 Cal.App.4th 1611, 1618, 19 Cal. Rptr.2d 459 (1993) (§ 800(b)(1) "requires that the plaintiff have been a shareholder of the corporation at the time of the wrong alleged in the complaint").

The question remains as to whether there is also a requirement of ownership—in this case, ownership of Next Level's shares—at the time the derivative action is filed. If BKP's allegations of wrongdoing against Defendants are true, however, it would be impossible for BKP to have been both (1) duped into exchanging their shares in Next Level for GIC shares, *and* (2) to maintain their ownership in Next Level at the time they filed their derivative action complaining about being duped. This Court is therefore not convinced that where a plaintiff loses his ownership as a result of the alleged wrongdoing, § 800(b) would be strictly construed to prevent such a plaintiff from maintaining a derivative action.

A derivative suit is an action in equity. *See Hogan v. Ingold,* 38 Cal.2d 802, 810, 243 P.2d 1 (1952). Hence, when the alleged wrong divests the plaintiff's ownership interest in the derivative corporation, the California courts have interpreted the derivative standing rules with much less rigidity than would have otherwise been the case. For instance, prior to the enactment of § 800, the California Supreme Court held that a former shareholder had standing to bring a derivative action because he retained a security interest in the stock he lost as a result of the alleged wrong that formed the basis of his derivative suit. *Weingand v. Atlantic Sav. & Loan Ass'n,* 1 Cal.3d 806, 818–19, 83 Cal. Rptr. 650, 464 P.2d 106 (1970). The court's reasoning was twofold: (1) any depreciation in the value of the derivative corporation's stock would have a corresponding effect on the plaintiff's security interest, thus the plaintiff's security interest in the derivative corporation was essentially the same as that of a shareholder; and (2) if the plaintiff has no derivative standing, no suit will be commenced, and no wrong will be remedied. *See id.* Although BKP has no security interest in Next level's stock, the difference between its ownership interest in Next Level's parent corporation and its ownership interest in Next Level is one of form, not substance. *See also Pearce v. Superior Court,* 149 Cal. App.3d 1058, 1066, 197 Cal.Rptr. 238 (1983) (California Supreme Court twice allowed derivative actions to proceed in which plaintiffs did not meet literal standing requirements and "[w]e assume that section 800's new contemporaneous ownership rule is a codification of these decisions").

This liberal interpretation of California's derivative standing has continued after the enactment of § 800. In *Gaillard v. Natomas Co.,* 173 Cal.App.3d 410, 219 Cal.Rptr. 74 (1985), the court squarely addressed an issue quite similar to that which is in contention here. Just hours before the consummation of a stock-for-stock merger, a shareholder filed a derivative suit, challenging the defendants' acts that affected the merger. *See id.* at 413, 219 Cal.Rptr. 74. The merger was

perfected, the plaintiff's shares were exchanged for shares in the derivative corporation's parent corporation, and the real party defendants moved for a dismissal of the derivative suit on the grounds that the plaintiff no longer had derivative standing. *See id.* After noting that the plaintiff retained a continuing financial stake in the derivative suit, the court forcefully acknowledged that:

> the imposition of a continuing ownership requirement in this case would lead to the incongruous result of barring a lawsuit which challenges the wrongful acts of management in bringing about the merger, because of the merger itself. To hold that a merger has the effect of destroying such causes of action would be tantamount to giving free reign to deliberate corporate pilfering by management and then immunizing those responsible from liability by virtue of the merger which they arranged. This would be a grossly inequitable result.

*Id.* at 420, 219 Cal.Rptr. 74. Accordingly, the court held that the former shareholder retained his derivative standing. *Id.* at 422, 219 Cal.Rptr. 74.

Defendants attempt to distinguish the holding in *Gaillard* by arguing that it only applies in those rare and fortuitous instances when the plaintiff initiates the derivative suit before the merger is consummated and then agrees to sell his shares. While it is true that the plaintiff in *Gaillard* owned an interest in the derivative corporation when the suit was filed and BKP did not, Defendants offer no explanation for such a narrow interpretation of *Gaillard;* and the Court can see none.

If the holding in *Gaillard* was predicated on *when* the suit was filed rather than *why* the plaintiff no longer owns an interest in the derivative corporation, then the plaintiff could file a derivative suit, sell his shares in the derivative corporation for an interest in the parent corporation that he believes will compensate him for the alleged wrong, and then recover again when the derivative corporation (his investment's investment) recovers. This double benefit would also be available if the plaintiff sold his derivative stock and then filed a derivative suit. Thus, whether the plaintiff lost his interest in the derivative corporation before or after the derivative suit is filed adds nothing. What is important is whether the alleged wrong involuntarily divested the plaintiff of his ownership interest. In that case, the alleged wrong will not enter into his deliberations, thus the consideration he will accept for his shares in the derivative corporation will not include the value he believes the alleged wrong is worth.

The Court, therefore, finds that the holding in *Gaillard* was predicated on the fact that the alleged wrong divested the plaintiff's ownership interest in the derivative corporation, not the timing of this divestment. Thus, the reasoning in *Gaillard* is consistent with the facts in this case, and since the Court is aware of no California decision with similar facts that is inconsistent with its holding, the Court adopts the approach taken in *Gaillard* and holds that BKP has standing to bring its derivative suit on behalf of Next Level.

### B. *Demand Futility*

■ The derivative suit filed on behalf of GIC is also not free from attack. Defendants argue that this derivative suit should be dismissed because the Complaint fails to allege particularized facts that, if true, would excuse Lazar from making a pre-suit demand on GIC's Directors. Under Delaware law,[5] pre-suit demand is excused if "the allegations raise a reasonable doubt as to (i) director disinterest *or* independence *or* (ii) whether the directors exercised proper business judgment in approving the challenged transaction." *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988) (emphasis added).[6]

---

**5.** *See Kamen v. Kemper Fin. Servs.,* 500 U.S. 90, 96–97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (holding that the demand futility doctrine is governed by the law of the state of the derivative corporation's incorporation).

**6.** Of course, a finding of demand futility does not preclude the corporation from subsequently appointing a disinterested litigation committee to assess the merits of going forward with the litigation. *See Zapata Corp. v. Maldonado,* 430 A.2d 779, 786 (Del.1981); 8 Del. C. § 141(c)(1). But this prospective right has nothing to do with whether the plaintiff's demand on the Directors when the suit was filed would have been futile. Indeed, when a special litigation committee is appointed, the Delaware courts apply a heightened two-step analysis, whereby the defendants initially bear the burden of demonstrating the independence, good faith, and reasonableness of

An "interested" director is one who receives "a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." *Rales v. Blasband*, 634 A.2d 927, 933 (Del.1993). Lazar argues that a pre-suit demand would have been futile because a majority of the Directors sold their stock at an artificially inflated value—specifically, they sold their stock before GIC disclosed the problems it was having with the development of two of its new products. *Strougo v. Carroll*, 1991 WL 9978, at *1 (Del. Ch. Jan. 29, 1991) is in accord. There, the court held that even though the complaint did not allege a conspiracy to engage in insider trading, demand was excused because "the defendant directors allegedly engaged in insider trading within a matter of weeks based upon the same inside information." *Id.* at *4.

Defendants' attempt to distinguish this holding is exceedingly weak, almost perfunctory. It is true that the Defendants sold their stock on eight separate occasions, and this was accomplished over a span of five months. Yet, this distinction trips on the fact that a majority of the directors received more than 97% of the more than $530 million during the week of April 20, 1995. Moreover, the *Strougo* court only examined the proximity of the directors' trades because the plaintiff did *not* allege a conspiracy. *See id.* Not only does Lazar's Complaint allege that the Defendants engaged in a conspiracy for the purpose of profiting from the sale of their GIC stock at its inflated value, but it is also peppered with specific allegations that, if true, would support this assertion. (*See, e.g.*, Pl.'s Deriv. Compl. at ¶¶ 36, 41, 49–59, 75–79, and 80–97.)

While the value of GIC's stock was allegedly inflated, six defendants—Brown, Strauss, O'Rourke, Akerson, MBO–IV, and Instrument Partners—sold their GIC stock for more than a half a billion dollars. That these defendants received a personal financial benefit cannot be denied; and since Lazard, as well as the other public shareholders, neither sold his stock nor had access to the adverse information until it was publicly disclosed, it perforce follows that this benefit was not equally shared by the other shareholders.

Defendants' position that the general partners of MBO–IV and Instrument Partners (T. Forstmann, N. Forstmann, Akerson, and Klinsky) did not receive a personal financial benefit is also not persuasive. Such an argument ignores the substance of the relationship they had with one another. A "partnership" is merely an "association of two or more persons to carry on as co-owners a business for profit." Uniform Partnership Act, § 101(6). Indeed, as general partners of the MBO–IV and Instrument Partners partnerships, T. Forstmann, N. Forstmann, Akerson, and Klinsky participated in the partnerships' profits and jointly and severally shared in its liabilities. *See id.* at § 306(a). Thus, their interest in the challenged transactions that gave rise to the benefits they received is substantively indistinguishable from the interest Brown, Strauss, and O'Rourke had in the same challenged transactions that gave rise to the benefits they received.

Defendants also attempt to delimit the scope of the demand futility doctrine by arguing that a majority of the board is disinterested because the Complaint does not assert particularized facts that demonstrate that the six "outside" directors sold their stock while in possession of material non-public information. As a result, Defendants contend, Lazar has failed to properly plead scienter, an essential element of a claim for insider trading under § 10(b) of the Exchange Act. Whether this is true is besides the point.

Lazar's Complaint is not about § 10(b) of the Exchange Act. It is about state law violations, breaches of fiduciary duties, and it is only before the Court because the parties satisfy diversity jurisdiction. The animating principle of the demand futility doctrine is that the directors can not faithfully decide whether proceeding with the corporation's litigation is in the corporation's best interest

their investigation, and then the court exercises its own business judgement with regard to the committee's decision. *See id.* at 788–89; *Kaplan v. Wyatt*, 484 A.2d 501, 506–12 (Del.Ch.1984), *aff'd*, 499 A.2d 1184 (Del.1985) Thus, Defendants' contention—that the Directors' ability to prospectively appoint a special litigation committee precludes a finding of demand futility—is plainly amiss.

when the complaint seeks redress for the conduct that gives rise to the personal financial benefit for which the directors alone have received. *See Aronson,* 473 A.2d at 814. The case law, therefore, makes it clear that the personal benefit must arise "from the challenged transaction." *Rales,* 634 A.2d at 933.

Here, the conduct complained of involves the concealing of adverse financial information and the failure of the Directors to properly manage the corporation's affairs. It is further alleged that such conduct misled the investing public and thereby artificially inflated the value of the GIC stock. Since seven of the Directors sold their stock at its allegedly inflated value, they alone received a personal financial benefit, which arose from the alleged wrongs that form the gravamen of the Complaint. Accordingly, the facts alleged in the Complaint, if true, raise a "reasonable doubt" that a majority of the Directors are disinterested in the derivative suit.

The Complaint also alleges particularized facts that are sufficient to create a reasonable doubt as to the Directors' independence in the challenged transactions. "Independence" exists when the director bases his decision "on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson,* 473 A.2d at 816. The Complaint claims that a majority of the Directors are controlled by FLC because (1) FCL is GIC's largest shareholder; (2) Akerson, T. Forstmann, Klinsky, N. Forstmann, and Stern are affiliated with FLC; (3) Strauss is T. Forstmann's business advisor, and T. Forstmann is one of the controlling partners of FLC; (4) Meyerson is on the board of two of FLC's wholly owned subsidiaries; (5) Rohatyn is a senior partner of the firm that underwrote the Secondary Offering; (6) the Directors have entangling financial, personal, and business interests and dependencies; (7) the Directors have approved and benefitted from the alleged wrongs; (8) FLC placed on GIC's board ten of its thirteen Directors; and (9) the Directors would face an exceedingly large uninsured liability were they to decide to sue themselves and lose.

While none of these allegations standing alone may be sufficient to excuse demand, the totality of these allegations, if proven, plainly raises a reasonable doubt that a majority of the Directors were not independent when this suit was filed. *See In re Storage Technology Corp. Sec. Litig.,* 804 F.Supp. 1368, 1375–76 (D.Colo.1992) (demand is excused when the totality of allegations raise a reasonable doubt of director disinterest or independence). Under the demand futility doctrine, the Court therefore holds that Lazar was excused from making a pre-suit demand on GIC's Directors.

### CONCLUSION

For the foregoing reasons, the Court grants with prejudice Defendants' motion to dismiss Count I of BKP Partners' Second Amended Complaint and denies Defendants' motion to dismiss the Second Amended Derivative Complaint and Counts IV, VII, and IX of BKP Partners' Second Amended Complaint.